UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:24-cr-00088-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CARSON LEE MAYNARD, AMY MARIE TILLMAN | |
| Defendants. | |

## INTRODUCTION

Before the Court is the Motion to Suppress filed jointly by Defendants Carson Maynard and Amy Tillman (Dkt. 55). The Court held an evidentiary hearing on April 22, 2025. At the conclusion of the hearing, the Court issued an oral ruling denying the motion. The Court now issues this written opinion to clarify certain factual findings.

## BACKGROUND

This motion to suppress stems from a pre-dawn traffic stop on February 8, 2024. A few days prior, Corporal Scheierman of the Idaho State Police had been alerted by Sergeant Beck of the Montana Highway Patrol that a silver Chrysler 300 would soon be traveling through the area with a large quantity of drugs. Sergeant Beck asked Corporal Scheierman to run the vehicle's license plate through a

license plate reader (LRP) system. On February 6, Corporal Scheierman received an LRP "hit" showing that the vehicle was traveling south in the Las Vegas area. On February 7, a second hit showed that the vehicle was going northbound.

Early in the morning on February 8, Corporal Scheierman was parked on the side of Interstate 15 with his bright lights and takedown bar light turned on. Around 2:40 a.m., he observed a silver Chrysler 300 driving northbound on Interstate 15 in Bannock County, Idaho. The Chrysler's windows were dark enough that he could not see anything inside, even the silhouettes of occupants. He followed the vehicle and observed that its license plate number matched the tip from Montana law enforcement. The license plate had a frame from the dealership that partially cut off the letters spelling out MONTANA but did not obscure the plate number, which he accurately reported to dispatch. At approximately 2:41 a.m., he initiated a traffic stop for an obstructed license plate in violation of Idaho Code § 49-928 and excessively tinted windows in violation of Idaho Code § 49-944. He also called K9 Officer Brasley and asked him to be on alert nearby for a potential dog sniff of the vehicle.

The following timeline, which the Court will set out in detail, comes from the dashcam of Corporal Scheierman's patrol vehicle. At 2:41:58 a.m., Corporal Scheierman approached the passenger side of the Chrysler and asked about the window tint level. The driver, later identified as Amy Tillman, stated that she

believed the tint was 24%.[1] Idaho state law generally prohibits window tint darker than 35%. Corporal Scheierman also informed Ms. Tillman that her license plate frame could not cover the name of the state. He then asked for her license and registration. While she searched the documents, he spoke with the passenger, later identified as Carson Maynard, about where they were going. Mr. Maynard, who appeared nervous and was not wearing pants, said they were coming from Jackpot. Corporal Scheierman also tested the window tint, which measured at 17%.

Ms. Tillman produced the vehicle registration, which was in Mr. Maynard's name, but could not find her driver's license. Corporal Scheierman gave her three to four minutes to search but found it suspicions that she kept checking the same places. He then asked her to leave the vehicle and come to his patrol car so that he could look for her license in his computer system. This, he believed, would be faster than asking dispatch to look up the same information and report their findings back to him.

At 2:44:40 a.m., Ms. Tillman exited her vehicle. She followed Corporal Scheierman to his patrol car and sat in the front seat. Corporal Scheierman opened his laptop and used one hand to start the program for checking Ms. Tillman's

---

[1] The percentages used to assess whether tinted windows are compliant with state law, are stated as percentages of light transmission through the tinted windows.   A tinted window's light transmission of only 24% is, accordingly, substantially more tinted than the statutory limit of 35%.

license. With his other hand, he called for assistance from Corporal Braswell. Corporal Braswell received the call at 2:45:12 a.m.

At 2:45:55 a.m., with the computer program activated, Corporal Scheierman asked Ms. Tillman for the state of her driver's license, her name, and her date of birth. He ran the information through his in-car computer and verified her identity. He then began writing Ms. Tillman a written warning. The process of writing the citation was slightly prolonged because Ms. Tillman did not have her license, which meant that Corporal Scheierman had to go back and forth between two computer systems to create the warning.

Around the same time, Corporal Braswell arrived with his K9 partner Moose. At 2:48:18 a.m., as Corporal Scheierman continued writing the warning, Moose began a sniff check around the vehicle. His behavior quickly changed in a manner that indicated the likely presence of narcotics. Corporal Scheierman, who observed the dog's actions from his patrol car, asked Ms. Tillman if there were drugs in the vehicle. She said no but added that they had only purchased the vehicle about a month ago. At 2:49:26 a.m., Moose gave a final alert as to the presence of narcotics. At this point, about eight minutes had elapsed since the initiation of the stop, and five minutes since Ms. Tillman exited her vehicle. Corporal Braswell rewarded Moose and informed dispatch about the positive alert.

At this point, Corporal Scheierman was still completing the warning. He

asked Ms. Tillman again about illegal drugs, this time naming specific drugs. She admitted to having "an edible" and said she was unsure of state laws on marijuana. He responded that marijuana was illegal in Idaho and that the vehicle would be searched. Corporal Scheierman then ordered Mr. Maynard out of the vehicle, after allowing him to put on pants, and placed him in the back of the patrol car.

In the trunk of the vehicle, Corporal Scheierman initially located THC edibles, a mug with multiple syringes, two methamphetamine pipes, and two vials of steroids. Mr. Maynard and Ms. Tillman were advised of their Miranda rights. Corporal Scheierman also located a spare tire that was suspiciously heavy. Ms. Tillman admitted that it contained large quantities of methamphetamine and fentanyl. When Corporal Scheierman opened the tire, he found approximately five pounds of methamphetamine, 500-1000 fentanyl pills, and a small quantity of an unknown white substance. Mr. Maynard and Ms. Tillman now seek to suppress this evidence.

## LEGAL STANDARD

In a motion to suppress under the Fourth Amendment, the defendant bears the initial burden of showing, by a preponderance of evidence, that a warrantless search of seizure occurs. *See United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The burden then shifts to the government to establish a justification or exception to the warrant requirement by a preponderance of the evidence. *See*

*United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974).

## ANALYSIS

Mr. Maynard and Ms. Tillman argue that law enforcement lacked reasonable suspicion to pull them over and unlawfully prolonged the stop. The Court will briefly address reasonable suspicion before providing a more detailed analysis of the length of the stop.

### 1. Reasonable Suspicion

#### A. Obstructed License Plate

First, the Government has not demonstrated that Corporal Scheierman had reasonable suspicion to initiate a stop based on the obstructed license plate. Idaho Code § 49-428 provides, "Every license plate shall at all times . . . be in a place and position to be clearly visible, and be maintained free from foreign materials and in a condition to be clearly legible." The Government argues that there was reasonable suspicion for a violation of this statute based on the dealership frame around the license plate, which did not obstruct the plate number but did partially cover the state name.

This interpretation stretches the statute beyond reason. The Supreme Court of Idaho has construed § 49-428 based on its plain meaning:

> A plain reading of the statute indicates a license plate must be in a place and a position to be clearly visible. Visible means "capable of being seen," "perceptible by vision," "easily seen." *Webster's Third New Int'l. Dict.* 2557 (3d ed. 1993). "Clearly" means "in a clear

manner," "without doubt or question."

*State v. Tregeagle*, 391 P.3d 21, 25 (Idaho 2017).

Here, photo evidence shows that the license plate was "capable of being seen" and "perceptible by vision." Whether it was "clearly" visible is a slightly closer question due to the size of the border. But here, unlike in *Tregeagle*, law enforcement was able to accurately inform dispatch of the license plate number— his comment that it was "obstructed" notwithstanding. The Court therefore finds that a reasonable officer in Corporal Scheierman's position would not suspect that the plate was obstructed in violation of state law. Accordingly, the traffic stop was not justified based on a suspected violation of § 49-428.

### B. Tinted Windows

The window tint violation, on the other hand, does provide reasonable suspicion for the traffic stop. Idaho Code § 49-994(1)(b) states that window tinting film must have a light transmission of at least 35% (with a lower percentage indicating a darker tint). Before Corporal Scheierman initiated the traffic stop, he observed that Defendants' vehicle was completely dark, to the point that he could not see even silhouettes of occupants. When he measured the window tint, it did indeed test at 17%, far darker than Idaho's limit.

Defendants argue that it was not possible for the officer to perceive this in the dark, suggesting perhaps that it was just a lucky guess or completely fabricated.

To support this, they provide a series of photos of vehicles with "stock window tint" taken at night. *Dec. of John Souza*, Dkt. 57. Importantly, there is no indication of the lighting conditions under which the photos were taken, and no evidence of the light transmission of the tinted windows used in the demonstration. This "comparator" evidence, therefore, is simply not "comparable." Nor is it persuasive. The Court finds that the Government has established reasonable suspicion for the stop based on a violation of § 49-994.

### C. Reasonable Suspicion of Drug Crimes

Next, the Government attempts to expand the scope of the stop by claiming that Corporal Scheierman had reasonable suspicion of drug crimes at the outset based on the information relayed by the Montana Highway Patrol. The Court disagrees.

The doctrine of collective knowledge allows facts known by one law enforcement agent to be imputed to others in two situations. First, "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned." *United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007). Second, "where an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion directs or requests that another officer. . . conduct a stop, search, or arrest." *Id.*

Neither applies here. First, Corporal Scheierman was not working on an investigation with Montana law enforcement. He merely heard that a car with drugs would coming through the area, and he decided to act on the statement from Sergeant Beck. Second, the Government has not established that Sergeant Beck had direct personal knowledge of facts that would establish reasonable suspicion, or even that he asked Corporal Scheierman to conduct the stop.

Accordingly, Corporal Scheierman lacked "articulable facts" that would give rise to reasonable suspicion of a drug offense. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). He knew that the vehicle's windows were tinted, its license plate had a frame, the occupants appeared nervous, and the passenger was not wearing pants. These circumstances do not rise to the level of reasonable suspicion of anything except a window tint violation.

## 2. Length of Stop

The Court has thus determined that law enforcement had reasonable suspicion only of a traffic violation. The final question is whether Corporal Scheierman prolonged the stop beyond the amount of time needed to investigate that violation. He did not.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The

"mission" of a stop can include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 349. Beyond this, an officer may conduct "unrelated checks" only if that investigation does not prolong the traffic stop. *Id.* at 354. If the additional investigation adds *any* time to a traffic stop, law enforcement must possess independent reasonable suspicion to support that work. *United States v. Landeros*, 913 F.3d 862, 867 (2019). This "includes investigations that result in only a 'de minimis' prolongation of the stop." *United States v. Steinman*, 130 F.4th 693, 704 (9th Cir. 2025).

Here, Corporal Scheierman's testimony together with the dashcam footage show that all "additional investigation" separate from the traffic stop occurred while he was simultaneously completing his investigation of the traffic violation. The process of verifying Ms. Tillman's identity and writing the warning took longer than usual, but this was because she did not have her driver's license, not because Corporal Scheierman dragged out the stop. For the same reason, it was entirely reasonable for him to order Ms. Tillman out of her vehicle and into his patrol car, so he could ensure an accurate identification by comparing her facial features to the driver's license photo that he intended to access on his laptop computer. *See United States v. Steinman*, 130 F.4th 693, 705 (9th Cir. 2025). The traffic stop investigation was still underway when the canine arrived and gave a

MEMORANDUM DECISION ORDER - 10

positive alert, establishing probable cause for the subsequent search. The evidence establishes that the stop—which lasted less than ten minutes—was not unlawfully prolonged.

## ORDER

Therefore, **IT IS HEREBY ORDERED** that Defendants' Motion to Suppress (Dkt. 55) is **DENIED**.

DATED: May 12, 2025

_____
B. Lynn Winmill
U.S. District Court Judge